**Lucinda R. LaCHANCE, Administratrix of the Estate of David George LaChance, deceased, Appellant**

v.

**MICHAEL BAKER CORPORATION and Commonwealth of Pennsylvania, Department of Transportation.**

Commonwealth Court of Pennsylvania.

Argued Dec. 6, 2004.

Decided Feb. 9, 2005.

As Amended Feb. 10, 2005.

Reargument Denied April 7, 2005.

Edward C. Sweeney, Downingtown, for appellant.

Howard G. Hopkirk, Harrisburg, for appellee, PA Dept. of Transp.

BEFORE: McGINLEY, Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

Lucinda R. LaChance, Administratrix of the Estate of David George LaChance (Estate), appeals from the decision of the Court of Common Pleas of Tioga County (trial court) granting summary judgment to the Pennsylvania Department of Transportation (PennDOT) in the Estate's wrongful death action. The trial court held that the Estate could not make out a common law claim of negligence against PennDOT, which is the initial burden of a plaintiff in a tort claim brought against a Commonwealth agency. Specifically, the Estate could not show a basis for holding PennDOT liable for the negligence of its contractor, Baker Heavy & Highway, Inc. (Baker).[1]

The facts material to this appeal are not in dispute. PennDOT awarded Baker a $25 million contract to improve a portion of State Route 6015 in Tioga County, known as the Flower Run Project. The project included, *inter alia*, the laying of underground reinforced concrete pipes almost six feet in diameter. On May 25, 1999, David G. LaChance (Decedent), suffered fatal injuries while grouting the outside of one of these pipes. The trench in which he was working collapsed, burying him up to his waist and pinning him against the pipe. Reproduced Record at 562a–563a (R.R. at —). Decedent was pulled from the trench and received immediate emergency medical treatment; unfortunately, he subsequently died as a result of fractures, brain trauma and bruises caused by the trench collapse.

On March 24, 2001, the Estate filed a wrongful death and survival action against PennDOT and Baker, alleging that PennDOT was negligent in its failure to supervise Baker and in its failure to inspect the trench that collapsed. After extensive dis-

---

1. Baker was not named as a defendant in the caption of the Estate's complaint; rather, Baker's affiliate, "Michael Baker Corporation," appeared in the caption. Both Baker and Michael Baker Corporation were named as defendants in the body of the Estate's complaint. Pursuant to its settlement agreement with the Estate, Michael Baker Corporation has been dismissed from the action; it is not known whether this settlement includes Baker.

covery, PennDOT moved for summary judgment on the grounds that it was not vicariously liable for the negligence of Baker in carrying out the construction project and that any claims against PennDOT for failing to supervise or inspect the project were barred by sovereign immunity.[2] The trial court denied PennDOT's motion. Thereafter, PennDOT sought reconsideration on the basis of a recent decision of this Court in *Dunkle v. Middleburg Municipal Authority,* 842 A.2d 477 (Pa. Cmwlth.2004) *appeal denied,* —— Pa. ——, 860 A.2d 491 (2004). After reconsideration, the trial court granted PennDOT summary judgment.

In so ruling, the trial court determined that the Estate could not satisfy the demands of a common law cause of action in tort against PennDOT. The negligent acts of a general contractor are not normally attributed to the person who hires the contractor. An exception to this rule has been recognized for the circumstance where there is a peculiar risk known to the employer of the contractor that is not known to the contractor. Relying on this Court's decision in *Dunkle* that a trench does not, in itself, present a "special danger or peculiar risk," the trial court held that the Estate could not meet the peculiar risk exception and, thus, hold PennDOT liable for the acts of Baker. Further, although PennDOT had the contract right to supervise Baker's work on the Flower Run

Project, the trial court found that Penn-DOT's control was not such that Baker was not free to do the work in its own way. Accordingly, the Estate could not make the case for holding PennDOT liable under the "retained control" exception to the general rule that a landowner is not liable for the negligence of the contractors it hires. The Estate then appealed the trial court's grant of summary judgment to PennDOT.

On appeal,[3] the Estate presents three issues for our consideration. First, the Estate contends that the trial court erred in granting reconsideration on the basis of *Dunkle* because the Estate's theory of liability was not the peculiar risk exception but, rather, the "retained control exception." Second, the Estate contends that the trial court abused its discretion by ignoring the Estate's evidence of control and, as a result, the trial court improperly viewed the evidence in a light most favorable to PennDOT rather than to the Estate, as was required in the court's consideration of PennDOT's motion for summary judgment. Third, the Estate contends that the facts of this case present a "peculiar risk," distinguishing it from *Dunkle;* alternatively, the Estate suggests that the Court overrule *Dunkle.*[4]

■ We consider, first, the merits of the Estate's argument that the material facts

---

**2.** PennDOT, as a Commonwealth party, enjoys sovereign immunity except for those actions where immunity is specifically waived. 1 Pa.C.S. § 2310; 42 Pa.C.S. § 8521.

**3.** Summary judgment is properly granted where there is no genuine issue of material fact as to a necessary element of a cause of action and the moving party has clearly established entitlement to judgment as a matter of law. *Herman v. Greene County Fair Board,* 112 Pa.Cmwlth. 615, 535 A.2d 1251, 1253–1254 (1988); Pa. R.C.P. No. 1035.2. The record must be viewed in the light most favor-

able to the opposing party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Dean v. Department of Transportation,* 561 Pa. 503, 507, 751 A.2d 1130, 1132 (2000). Our scope of review of a trial court's grant of summary judgment is limited to determining whether the trial court committed an error of law or an abuse of discretion. *Irish v. Lehigh County Housing Authority,* 751 A.2d 1201, 1203 n. 4 (Pa.Cmwlth.2000).

**4.** The holding of a panel may be reversed by the Court acting *en banc.*

not in dispute support the conclusion that the Estate had a common law claim for negligence against PennDOT under the "retained control" exception. In doing so, we resolve the Estate's first two issues.

■ A party may proceed against a Commonwealth agency if it can establish that damages would have been recoverable under common law (or a statute creating a cause of action) had the injury been caused by a defendant not protected by sovereign immunity. 42 Pa.C.S. § 8522(a).[5] Additionally, the alleged negligent act must fall within one of the specifically enumerated exceptions provided by the legislature. Accordingly, the Estate had to first show, first, that PennDOT had liability under a theory of common law negligence and, second, that this negligence fell under the real estate exception to sovereign immunity.[6]

5. It provides:
   (a) **Liability imposed.**—The General Assembly, pursuant to section 11 of Article I of the Constitution of Pennsylvania, does hereby waive, in the instances set forth in subsection (b) only and only to the extent set forth in this subchapter and within the limits set forth in section 8528 (relating to limitations on damages), sovereign immunity as a bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity.
   42 Pa.C.S. § 8522(a).

6. The Estate asserted the real estate exception. The Judicial Code states:
   (b) **Acts which may impose liability.**—The following acts by a Commonwealth party may result in the imposition of liability on the Commonwealth and the defense of sovereign immunity shall not be raised to claims for damages caused by:
   
   ＊ ＊ ＊
   
   (4) **Commonwealth real estate, highways and sidewalks.**—A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned

*Bottoms v. Southeastern Pennsylvania Transportation Authority,* 805 A.2d 47, 48–49 (Pa.Cmwlth.2002). It was this initial burden that the Estate did not meet.

■ The legal principles essential to the Estate's cause of action may be summarized as follows. An owner of property does not have a duty to protect the employees of an independent contractor from risks arising from or created by the job contracted. *Celender v. Allegheny County Sanitary Authority,* 208 Pa.Super. 390, 222 A.2d 461, 463 (1966). However, under Section 414 of the RESTATEMENT (SECOND) OF TORTS, the landowner that retains and exercises control over the work of the independent contractor can be held liable for failure to exercise that control reasonably;[7] it states:

real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except conditions described in paragraph (5).
42 Pa.C.S. § 8522(b)(4). Exceptions to sovereign immunity are to be strictly construed in light of the legislature's clear intent to insulate government from exposure to tort liability. *Kahres v. Henry,* 801 A.2d 650, 653 (Pa.Cmwlth.2002).

7. The Estate's claim that the trial court did not understand that the retained control exception was its basis of liability is unfounded. The trial court found neither exception to apply in this case, reasoning as follows:
   It is not surprising that PennDOT would take an interest in worker safety, nor that they could stop work on a project should a dangerous situation develop. However, [The Estate] *has provided no evidence that Baker was unable to perform the work in the manner in which they desired.* [The Estate] has not shown that PennDOT maintained such control over the project that Baker was not free to do the work in [its] own way. Therefore we find that § 414 of the Restatement (Second) of Torts does not apply in this case. We *also* find that because

One who entrusts work to an independent contractor, *but who retains the control of any part of the work, is subject to liability* for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1965) (emphasis added) (SECTION 414). The Comments explain what is meant by retained control, distinguishing it from other legal relationships, such as the legal relationship governed by the law of agency.[8] The retained control exception usually applies in the situation where a general contractor fails to use reasonable care in supervising its subcontractors.[9] While the general contractor's retained control may be less than that of a master over a servant, mere supervision over the work of a subcontractor, up to and including the right to stop a project, is not control sufficient to impose liability. The Comment explains the requisite degree of control as follows:

> c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. *It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must*

[the Estate] has *failed to provide factual information to prove that this particular trench presented a peculiar risk* or danger that they have not established a common law cause of action in tort against Penn-DOT.

Trial Court Opinion at 4–5 (emphasis added). This language demonstrates that the trial court understood that the Estate's theory of negligence was based upon the "retained control exception" and not just the peculiar risk exception.

8. The Comment states:

> a. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under

the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

SECTION 414 cmt. a.

9. The Comment states:

> b. The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so.

SECTION 414 cmt. b.

*be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*

SECTION 414 cmt. c (emphasis added).

The Estate asserts that it presented a wealth of evidence that PennDOT retained "top to bottom" control over the Flower Run Project that was overlooked by the trial court.[10] The Estates evidence consisted of three components: the contract between PennDOT and Baker, PennDOTs expressed concern for safety and PennDOTs actions.

With respect to the contract, the Estate focuses upon one provision, *i.e.*, the "partnering agreement." This provision states:

In accordance with Section 104.01, INTENT OF PLANS AND SPECIFICATIONS, and as follows:

(a) Covenant of Good Faith and Fair Dealing. This contract, in its performance and enforcement, imposes an obligation of good faith and fair dealing on the Contractor and the Department.

- The Contractor and the Department, with a position commitment to honesty and integrity, agree to the following mutual duties:

- To function within the laws and statutes applicable to their duties and responsibilities,

- To assist in the others performance,

- To avoid hindering the others performance,

- To proceed to fulfill obligations diligently, and

- To cooperate in the common endeavor of the contract.

(b) Voluntary Partnering. The Department intends to encourage the formation of a cohesive partnership with the Contractor and its principal subcontractors and suppliers. This partnership will be structured to draw on the strengths of each organization to identify and achieve reciprocal goals. *The objectives are effective and efficient contract performance and completion of all work within budget, on schedule, and in accordance with the plans and specifications.*

R.R. 113a (emphasis added).

The Estate places undue emphasis upon this provision. First, it fails to account for the stated and limited purpose of the partnership, which is contract performance. Second, the contract itself provides that

[t]he establishment of a partnership charter on this project *will not change the legal relationship of the parties* to the contract nor relieve either party of responsibility for any of the terms of the contract.

R.R. 115a (emphasis added). Regardless of the "partnership" description, the relationship of Baker and PennDOT was that of parties to a contract, each with separate contractual obligations. One of Bakers express contractual obligations was the as-

---

10. The Estate contends that PennDOT's control was a fact in dispute and that by granting summary judgment to PennDOT the trial court engaged in impermissible fact finding. We disagree. The facts on which the Estate based its claim of control were not in dispute. The contract terms are what they are. The trial court considered the Estate's evidence but found, as a matter of law, that this evidence failed to show the degree of control necessary for the "retained control exception" for imposing liability on a landowner. Specifically, the trial court explained the Estate "had not shown that PennDOT maintained such control over the project that Baker was not free to do the work in its own way." Trial Court Opinion at 4. In short, the operative facts are not in dispute; rather, the question is whether the trial court correctly applied the law to the facts.

·sumption of responsibility for project safe-.ty through compliance

> at all times with applicable Federal, State, and local laws, provisions, and policies governing safety and health, including the Federal Construction Safety Act (Public Law 91–54), ... Occupational Safety and Health Regulations for Construction, and subsequent publications updating these regulations.

Publication 408, Specifications, 107.08, (PennDOT 1994) (Publication 408).[11]

The contract provisions do not support the Estates claim that PennDOT had retained control within the meaning of SECTION 414. Indeed, the contract expressly provided that control of the project belonged to Baker. Publication 408, which has been incorporated into the contract, provides, in relevant part, that Baker was to

> [k]eep *direct control* of the contract and see that the work is properly supervised and is performed satisfactorily and efficiently. Supervise the work personally or appoint a competent superintendent or representative to be on the project at all times.

Publication 408 105.05(a), ("Control of Work, Responsibility of Contractor,") (emphasis added). Accordingly, Baker agreed that all its work would be performed "in the best and most workmanlike manner ... [and] that all materials furnished and labor performed shall be in strict and complete conformity ... with all parts of this contract ... subject to the inspection and acceptance of" PennDOT. R.R. 78a.

It is true that the contract gave PennDOTs engineers broad rights of inspection. For example, it provided.that:

**(a)General.** The work will be subject at all times to the inspection of the Engineer or the Engineers authorized assistants.... To prevent disputes and litigation, the Engineer will:

\* \* \*

- determine the answer to questions in relation to the project and its construction; and
- decide differences concerning the performance of the work covered by the contract.

\* \* \*

**(b)Authority to Suspend Work.** Work will be suspended, wholly or in part, for the following reasons:

- failure to carry out orders;
- failure to perform any provisions of the contract; or
- unforeseen conditions not anticipated in estimating the contract time required for the completion of the work.

Publication 408 105.01(a), (b). Further, PennDOTs right of inspection covered, specifically, the item of safety. Indeed, the "Contract Safety Guidelines and Responsibilities" in PennDOTs Project Office Manual for field inspectors provide that PennDOTs "inspection staff will continuously monitor safety on a routine basis." R.R. 440a.

However, PennDOT's inspection rights, exercised to assure itself that Baker performed its work safely, as Baker had

---

**11.** Publication 408 is incorporated and made part of the Contract at ¶ 1. R.R. 78a. The specifications in Publication 408 are issued periodically by PennDOT and incorporated by reference into contracts through reference to the date issued, along with Supplemental Specifications. *See, e.g.,* "408/94 Supplemental Specifications" to the Contract. R.R. 74a–75a.

agreed in its contract, did not make Penn-DOT the guarantor of the safety of Baker's employees. Publication 408 made safety the contractual responsibility of Baker, and PennDOTs safety guidelines specifically provided that "the *contractor is responsible for project safety.*" *Id.* (emphasis added). It was Baker's duty to discharge this responsibility by complying with all applicable Federal, State and local laws governing safety and health. PennDOT's authority to inspect safety did not alter the roles of Baker and PennDOT.[12] Baker's contract performance had to meet PennDOT's contract specifications, but Baker controlled the manner of performance. This is how contractual relationships work.

The other documents cited by the Estate do not support its assertion that Penn-DOT assumed control over project safety. Most of these documents do not relate to the Flower Run Project or simply support the uncontested fact that PennDOT had the right to ensure Baker's performance, such as through contractor performance reviews. One document that does relate to this specific contract is an e-mail sent three days after the accident.[13] As a request for information *after the fact,* this correspondence cannot logically support any conclusion about PennDOT's conduct *before* the accident. Reading the e-mail in a light most favorable to the Estate, it expresses, at most, an intention by Penn-DOT to assume more control over the safety of other, future construction projects.

The Estate's final evidence addresses PennDOT's actual conduct. The Estate contends that PennDOT's field inspector directed the pipe grouting, thereby exposing Decedent to the possibility of a trench collapse. Initially, grouting was done inside the pipe, but the inspector directed that it be grouted on the outside as well.[14] It is not clear whether this direction was a change in grouting procedures, as asserted by the Estate. The testimony indicates

12. According to the Project Office Manual for field inspectors, a contractor is to have had a pre-construction conference with the Penn-DOT District Project Safety Officer to review its proposed safety program and receive recommendations. Inspectors thereafter monitor the contractor's operations to see that the contractor performs in accordance with his written project safety program. Inspectors on site can stop work on a project if they see a major life-threatening safety issue that could not be resolved immediately with the contractor. Otherwise, if an inspector sees a non-life threatening safety concern, he is to notify the job foreman. If not corrected by the next day, the inspector is to notify the project superintendent. If not remedied by the next day, the inspector is to call the company's home office. If not resolved by the following day, the inspector is required to call OSHA and report the hazard. These procedures are inadequate, as claimed by the Estate, to make PennDOT, not Baker, the party responsible for safety.

13. It provides:

Subject: Tioga County Pipe Trench Collapse
Kerry: Hello! Hope you have [had] a nice holiday.
One of my construction TCISs read of a pipe trench incident on a Department construction project in Tioga County. In the interest of ensuring worker safety during pipe installation operations, he asked if I could get some information on the factors leading up to the incident. We would like to preclude a similar incident happening in District 5. Any information that you can share will be appreciated.
R.R. 420a.

14. PennDOT had the right to direct Baker to perform to contract expectations. This did not change Baker's contractual duty to be responsible for the safety of its own workers. PennDOT directed that the pipe be grouted inside and out, but it did not direct Baker by which employee, when or how to do it. Directing a contractor what to do is not the same as directing a contractor how to do it.

that different field inspectors directed grouting in accordance with their understanding of the specifications. Other testimony indicated that there were no standards for pipe grouting: "A contractor can grout a pipe however he wants to grout it." R.R. 706a.[15]

More to the point, PennDOT's directive to grout the outside of the pipe did not cause the accident. Rather, it was the method of digging, benching, bracing or shoring that trench that caused Decedent's fatal injuries. Responsibility for the trench belonged with Baker, which had absolute discretion in when and how to secure a trench. Generally the Publication 408 Specifications directing Bracing and Shoring for a Class 1, Class 2, Class 3 or Class 4 excavation provide: [16]

> Brace and shore sides of the excavation, *as necessary*. Remove the bracing and shoring when no longer required, unless otherwise indicated or permitted to remain in place.

Publication 408 203.3(h) (emphasis added). Specifically, Baker was to comply with the standards set forth in the RC–30M, Subsurface Drains, Pipe Placement, Excavation—Bedding—Backfill excavation drawing, which contained the notation: "In all excavation areas follow OSHA safety requirements." R.R. 387a. There is simply no evidence that PennDOT retained or exercised any control over the manner of the trenching or the operational details of

the trenching, which was the proximate cause of Decedent's injuries.

In sum, the evidence, contrary to the Estate's assertion, demonstrates that Baker retained authority to do the job as it saw fit. The evidence supports the conclusion that PennDOT's control over the Flower Run Project, generally, and over the trenching, in particular, was not sufficient to allow the Estate to impose liability under SECTION 414 of the RESTATEMENT. The case law precedent is also consistent with this conclusion.

In *Hader v. Coplay Cement Manufacturing Co.*, 410 Pa. 139, 189 A.2d 271 (1963), our Supreme Court considered SECTION 414. In *Hader,* an independent contractor was hired by Coplay to unload, assemble, and install a stone crusher and to erect a building to house the stone crusher. The plaintiff, an employee of Coplay, was injured by a fall on Coplay's property and brought suit under the general theory that Coplay failed to furnish a safe work place. Asserting that Coplay controlled the construction, the plaintiff showed, *inter alia*, that Coplay employed a technical advisor to oversee the installation of the crusher. On three occasions, this advisor showed the contractor's employees "how to set the 'wear plates,' how to set a 'precision pin' and how to see that the crusher fit." *Id.* at 153, 189 A.2d at 278. In addition, this technical advisor provided

---

**15.** The Estate made other references to the record to support its argument. For example:
Q: What do field inspectors do?
\* \* \*
A: They oversee your work, make sure you're doing your work properly, you know, ensure that the work is done the way it's supposed to be done.
R.R. 681a. Rather than demonstrating retention or assumption of control over the operational details of the project, this testimony

and other references confirm PennDOT's role as supervising compliance with the contract.

**16.** Each class defines excavations for different activities. A Class 4 excavation is "[e]xcavation for pipe culverts; pipe-arches; metal plate pipe; metal plate pipe-arches; … and excavation in excess of the standard depth for pavement base drains, pipe underdrains, subsurface drain outlets, and subgrade drains." Publication 408 § 204.1(c).

advice to the contractor's employees when the contractor's foreman was not available.

The Supreme Court concluded that the technical advisor was merely acting as a "watchdog" for the owner to insure that the contractor installed the crusher and erected the housing in accordance with the plans and specifications. The Court held:

> Such status in nowise conflicted with control of the work by [the contractor].... [O]ne who employs an independent contractor may also employ a person to ascertain that the work of the independent contractor is being done according to plans and specifications and the employment of such person in no way indicates that the independent contractor is being subjected to control. [The advisor's] presence on the job site on behalf of Coplay and the functions which he performed in nowise demonstrated any control by Coplay of the manner of installation of the crusher.

Id. at 153–154, 189 A.2d at 278–279 (citations omitted).[17] Here, there is no evidence that PennDOT instructed Baker's employees how to construct its trenches or how to do the job when Baker's foreman was unavailable. The record in this case is even stronger that PennDOT's engineers acted as mere watchdogs. Their presence on the job site did not indicate control, as that term is understood in Section 414.

The Estate argues, however, that its claim is governed by the Supreme Courts later holding in *Byrd v. Merwin*, 456 Pa. 516, 317 A.2d 280 (1974).[18] In *Byrd*, an individual employed by an electrical subcontractor brought an action against a landowner for injuries sustained when he fell through a staircase. The owner had instructed the electrical contractor when and where to work; further, the owner, not the general contractor, hired and paid the subcontractors. Finally, the general contractor testified that its control was second to that of the owner. Thus, the Supreme Court found the retained control exception to apply. *Byrd* is factually distinguishable from this case because Bakers control over the Flower Run Project, as stated in the contract, was second to none.

---

**17.** The Supreme Court's analysis has stood the test of time. *See Celender v. Allegheny County Sanitary Authority*, 208 Pa.Super. 390, 222 A.2d 461 (1966) (contract giving landowner the right to require contractor's fulfillment of safety requirements did not, as a matter of law, constitute such control of the work or premises as to impose liability on landowner); *Brletich v. United States Steel Corp.*, 445 Pa. 525, 285 A.2d 133 (1971) (contract giving owner the right to inspect and approve the work and the ability to take control of the premises from contractor insufficient to create exception to *Hader* principle, even where owner employed engineers or inspectors to make sure contractor was complying with terms of contract). Retention of such powers is consistent with an employer's legitimate interest in assuring itself that the contractor is properly fulfilling its obligations.

**18.** The Estate also contends that *Bullman v. Giuntoli*, 761 A.2d 566 (Pa.Super.2000) and *DiSalvatore v. United States*, 456 F.Supp. 1079 (E.D.Pa.1978) are persuasive. In *Bullman*, a guest filed a negligence action against a homeowner and building contractor for injuries sustained from a fall at a construction site. The Superior Court found that there was a question of material fact whether the homeowner had exercised the requisite level of control because the facts of record indicated that the homeowner had maintained an active oversight and had reserved responsibility for completing certain parts of the project for himself. *DiSalvatore* involved a claim that the government negligently failed to coordinate the work between subcontractors, as required under the contract of the parties. An elevator shaft was left uncovered, and the plaintiff fell to his death. The *Bullman* and *DiSalvatore* cases are inapposite. In each case, control was not vested in the contractor, unlike this case.

In sum, the Estate's evidence showed that PennDOT has taken steps to ensure that its highway construction projects are completed efficiently and safely. This is only appropriate for a $25 million project like the Flower Run Project. Ensuring that Baker performed in accordance with its contractual duties is not the same as guaranteeing the safety of Baker's employees. Baker was compensated, in part, to complete the Flower Run Project in a safe manner. The evidence of PennDOT's alleged control proffered by the Estate consisted principally of standard contract terms. Were we to draw the conclusion suggested by the Estate, we would make PennDOT liable for damages whenever the employee of any construction contractor is injured. This is not consistent with the notion that landowner liability for the negligence of the contractors it hires is exceptional, not routine. To find liability simply because PennDOT addresses the issue of safety in its construction contracts would only encourage PennDOT to disregard safety in its contracts. Sound public policy, however, dictates that PennDOT monitor the safety of highway construction projects and continue to pay its contractors to conduct safe job sites.

■ In its last issue, the Estate contends that the facts of this case bring it within the ambit of the peculiar risk exception. It argues that this case is distinguishable from *Dunkle v. Middleburg Municipal Authority*, 842 A.2d 477 (Pa. Cmwlth.2004), *appeal denied,* —— Pa. ——, 860 A.2d 491 (2004), because the risks of the trenching operation were different from the usual and ordinary risks associated with this general type of work. The Estate argues that heavy rains in the days before the trenching operation and the presence of water in the open trench for a number of days made the operation unusually dangerous.

In *Dunkle,* we noted that the Pennsylvania test for applying the peculiar risk exception requires that the risk must be one caused by something other than the contractor's negligence.[19] In *Dunkle,* the parents of a worker who was killed by the collapse of a sewer trench brought a negligence action against the municipal authority that had hired the decedent's employer to excavate the trench. The decedent had been working in a deep trench excavated in shale; a trench box had not been installed and no other precautions had been taken. The plaintiffs argued that working in a trench excavated in unstable shale presented a special danger or peculiar risk. We disagreed, reasoning that working in a sewer trench in stable or unstable soil was nothing more than a common routine worksite procedure, requiring protective measures, such as a trench box, to support the walls. To accept the argument that all excavation work involved a special danger or peculiar risk would render the terms "special danger" or "peculiar risk" meaningless. *Dunkle,* 842 A.2d at 484. We explained that in order to constitute a special danger or peculiar risk, a plaintiff would have to establish that the risk is different from the usual and ordinary risk associat-

---

19. The time honored test is:
1) Was the risk foreseeable to the employer of the independent contractor at the time the contract was executed?; and 2) Was the risk different from the usual and ordinary risk associated with the general type of work done, *i.e.,* does the specific project or task chosen by the employer involve circumstances that were substantially out-of-the-ordinary?

*Dunkle,* 842 A.2d. at 482 (quoting *Motter v. Meadows Limited Partnership,* 451 Pa.Super. 520, 680 A.2d 887, 890 (1996)).

ed with the general type of work. For example, excavating a trench next to an abandoned mine shaft could cause an explosion or instant flood, the kind of peculiar risk intended by the RESTATEMENT exceptions. *Id.* at 484–485.

As in *Dunkle*, the Estate produced no evidence that the type of trenching undertaken in the Flower Run Project presented a peculiar risk or inherent danger different from the usual and ordinary risks associated with digging a trench. The possibility always exists that soil surrounding a trench will be rendered unstable by rain. The contract expressly required Baker to take precautionary measures against a trench collapse by bracing the trench *as necessary*.[20]

The Estate failed to establish that PennDOT retained control over the manner of Baker's work on the Flower Run Project or that the trench that collapsed around Decedent presented a peculiar risk. The trial court correctly applied the common law rule that an employer cannot be held vicariously liable for the tortious conduct of its contractors. As such, the Estate did not establish a common law claim against PennDOT, a prerequisite to defeating a claim of sovereign immunity, and the trial court correctly granted summary judgment in favor of PennDOT.

Accordingly the decision of the trial court is affirmed.

### ORDER

AND NOW, this 9th day of February, 2005, the order of the Court of Common Pleas of Tioga County, dated May 24, 2004, in the above-captioned matter is hereby affirmed.

---

**20.** The Estate requests, alternatively, that we reverse *Dunkle*. Other than the Estate's disagreement with the *Dunkle* holding, we have been offered no reasons to reverse. We decline to take the steps necessary to reverse *Dunkle*. *See* 210 Pa.Code § 67.25.