## Zangrandi v. Kay Builders

502

_____, for plaintiff.
_____, for defendant.

REIBMAN, *J.*, July 24, 2012—Plaintiff, Gelson Zangrandi, has brought suit seeking recovery for damages alleged to have resulted when he slipped and fell off a roof upon which he had been laboring in the course of his employment with defendant Lima Construction, LLC ("Lima"), which had been hired by defendant Kay Builders ("Kay") to perform work on a home under construction. Kay moves for summary judgment, arguing there is no evidence indicating it retained sufficient control over the work being performed by the subcontractor that employed plaintiff so as to incur liability for plaintiff's injuries resulting from the fall. For the reasons explained below, the motion will be granted.

## I.

Kay owned a building lot and had hired Lima as

independent contractor to provide framing services on a newly constructed home to be built in accordance with blue-print specifications provided by Kay. (See dep. of plaintiff, at def. mot. sum J. ex. A; see also *id.* ex. C.) Consistent with that arrangement, Lima hired various workmen, including plaintiff, to frame the structure and install plywood sheathing on the roof. (See *id.*; see also dep of A. Silva, at def. mot sum J., ex. B.) On January 29, 2010, plaintiff was working on the roof and lost his footing. (*Ibid.*) Because no "cleat" had been nailed on the roof as a safety precaution to arrest the descent of a fallen worker, plaintiff cascaded off the ledge and incurred injuries including broken wrists as a result of his fall. (See pl. complaint.)

Plaintiff's employer, Lima, enjoys workers' compensation immunity for any damages. Plaintiff, however, seeks recovery from Kay, alleging that it was responsible for the worksite and, through its personnel who provided daily inspections to ensure conformance of the work to the plans, retained control over the work. As such, plaintiff maintains Kay is liable for common-law negligence based, in part, on alleged noncompliance with OSHA regulations, found at 29 C.F.R. § 1926.16, which impose joint responsibility on prime and subcontractors for worksite safety. Kay counters that the record in this matter fails to present an issue of material fact sufficient to support a conclusion that it retained control to the extent required under the decisional law so as to incur liability for an injury sustained by an employee of a subcontractor.

II.

Summary judgment is appropriate when there exist "no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Sphere Drake Ins. v. Phila. Gas Works*, 566 Pa. 541, 545, 782 A.2d 510, 512 (2001). In applying this test, the court must view the record "in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Washington v. Baxter*, 553 Pa. 434, 440, 719 A.2d 733, 736 (1998). Additionally, summary judgment should be granted "only in those cases which are free and clear from doubt." *Id.* Summary judgment is proper, however, when a "party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa. R.C.P. No. 1035.2 (2); *Ertel v. Patriot News Co.*, 544 Pa. 93, 100, 674 A.2d 1038, 1041-42 (1996). Furthermore, a trial court is not required to scour the record to identify facts of record precluding entry of summary judgment when the non-moving party has failed to do so. See *Harber Philadelphia Center City Office Ltd. v. LPCI Ltd. Partnership*, 764 A.2d 1100, 1105 (Pa. Super. 2000).

It has long been the general rule in Pennsylvania that "an owner of property does not have a duty to protect the employees of an independent contractor from risks arising from or created by the job contracted." *LaChance v Michael Baker Corp.* 869 A.2d 1054, 1057 (Pa. Cmwlth. 2005) (citing *Celender v Allegheny County Sanitary Authority*, 222 A.2d 461, 463 (Pa.Super. 1966)). In *LaChance*, Penn-DOT had awarded a road-construction contract to Baker

Heavy & Highway, Inc. *Id.* at 1055. Plaintiff, an employee of Baker, was fatally injured when a trench collapsed pressing him against a pipe on which he had been working. *Id.* at 1055. In determining whether the record included evidence sufficient to impose liability on PennDot, the court examined Section 414 of the second restatement of the law on torts rather extensively. It noted that in the event an owner retains control over the work, liability will result from the failure to exercise such control with reasonable care. However, in scrutinizing this provision of the restatement, the court underscored the following points contained in comment c of section 414, noting:

> In order for the rule stated in this section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. *It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*

*Id.* at 1058-59 (emphasis supplied by *LaChance*). Thus, notwithstanding the fact that PennDot had exercised its contractual "inspection rights . . . to assure itself that Baker performed its work safely," had engaged in "contractor

performance reviews," and even had a field inspector direct that the subject pipe work be performed so as to comply with contract specifications, the court declined to find that such activities constituted sufficient control over the manner of work to satisfy section 414's requirements, especially where there was no evidence that PennDOT directed the activities relating to inadequate bracing of the trench that resulted in the accident.

*Id.* at 1061-62.

Likewise, the issue of sufficient retention of control was squarely confronted by the Pennsylvanian Supreme Court in *Hader v. Coplay Cement Co.*, 410 Pa. 139, 189 A.2d 271 (1963). In that case, the defendant hired an independent contractor to install a stone crusher and surrounding building on its premises. *Id.* at 273. In the course of the project, the plaintiff, an employee of the contractor, sustained injuries when he fell from the structure. *Id.* at 274. Although barred from tort recovery against his employer by the workers compensation act, he sued the defendant, contending it had retained sufficient control of the premises and project so as to incur liability. *Id.* at 277-78. More specifically, the plaintiff argued that defendant's plant manager and its vice president visited the job-site frequently to observe the progress of the work and that the defendant had another employee on-site continuously to ensure that the work was being done according to the agreed-upon plans and specifications. *Id.* at 278.

Rejecting the notion that such measures constituted sufficient retention of control in order to result in liability, the Supreme Court observed: '"It is normal for an owner

or an interested party to visit the scene of new construction to observe the progress of the work. Such inspections of finished work furnish no evidence of a right to control the workmen[;] . . . inspection of the finished work shows only an interest in 'the result to be obtained.'" *Ibid.* The court acknowledged there existed evidence in that case of a continuous presence of a defendant's "watchdog" employee, who, on three occasions, advised the workers on how to install plates, set a pin, and ensure proper fit of the crusher. *Ibid.* However, the court further noted that the employee never gave explicit orders and, thus, did not interfere with the subcontractor's control of the work. *Ibid.* Therefore, liability would not attach. As the court explained: "[O]ne who employs an independent contractor may also employ a person to ascertain that the work of the independent contractor is being done according to plans and specifications and the employment of such person in no way indicates that the independent contractor is being subjected to control." Ibid, Accordingly, the Court upheld the entry of a nonsuit against the plaintiff. *Id.* at 279.

Conversely, where an owner exercises control, liability may attach. For instance, in *Bullman v Giuntoli*, 761 A.2d 566 (Pa. Super. 2000), the plaintiff sustained injuries when she fell off a plank into a basement as she was being escorted by the owner on a visit to the property-owner's construction site. There, the court held a question of material fact precluded summary judgment where the record indicated that the homeowner played "far more than a passive role in overseeing construction of house" and may not have relinquished full possession of the area where the fall occurred. *Id.* at 577-78. Similarly, in *Byrd*

*v. Merwin*, 456 Pa. 516, 317 A.2d 280 (1974), the owner retained control over the selection of subcontractors and the order in which they performed work on the overall renovation project. Consequently, the owner remained subject to liability for injuries to electrical subcontractor hurt when another subcontractor dropped a staircase on him. *Id.* at 282. There, the evidence supported inference of negligence by the homeowner both in the selection of stair installers — teenage boys who were previously reported to owner as "clowning around' on the job" — and in directing that their work be performed after, instead of prior to, the electrical work undertaken by the plaintiff. *Ibid.*

Finally, in relation to tort recovery premised on alleged violations of OSHA and shared regulatory obligations by prime-and subcontractors, our Supreme Court has instructed that, as a threshold matter, it must first be established that a defendant had control over the work performed by plaintiff, and absent that element, "liability does not attach." See *Leonard v. Commonwealth.* 565 Pa. 101, 107, 771 A.2d 1238, 1241 (2001) (interpreting 29 C.F.R. § 1926.16 to subject prime-contractors only to "enforcement provisions" of OSHA and holding tort liability governed by decisional law respecting control of work). In the present matter, the operative question thus becomes whether there exists any evidence that the conduct of Kay went beyond the presence of personnel to ascertain that the work of Lima and its employees, such as plaintiff, was being performed according to plans and specifications. If, as in *LaChance* and *Hader*, the record viewed in the light most favorable to plaintiff indicates

nothing more and provides no evidence from which it may reasonably be inferred that Kay subjected Lima and its workers to control over the manner of the framing and roofing work, as opposed to only the "result to be obtained," summary judgment must be entered in favor of Kay.

## III.

In resisting the motion for summary judgment, plaintiff emphasizes the presence of Kay personnel at the worksite. Specifically, he points to deposition testimony indicating that Kay employees "would inspect the work and check all facets of the work everyday," "supply all materials," "make changes to the plans," and in one instance stopped another independent contractor's work because it deemed it unsafe." (See Pl. brf [unpaginated] (citing dep. of Joe Alban).) Plaintiff further insists that a Kay employee, Joe Alban, "walked the work, site constantly checking for things such as contract adherence, progress, adherence to drawings scheduling and safety issues." In support of that conclusion, he cites the following deposition testimony:

[Pl. counsel] Q. ... Now, earlier I asked you to give me kind of a brief overview of your job responsibilities as rough supervisor. You said overseeing the independent contractors during breaking of the ground through drywall. Can you be a little more specific in what your daily responsibilities were in terms of overseeing these independent contractors?

[Joe Alban] A. Depending on which contractor. It varied. But, for the most part, it was to make sure that

they were complying with the blue print and making sure that the materials were there and that they had the right amount of materials, and to see if there was any discrepancies between the blueprint and change orders, that I would convey those changes and we would make them. Pretty much that's about it.

Q. And would you visit each job site each day?

A. I would try to, yes. Understand I had 20 to 30 houses under construction. So, sometimes I didn't get to all of them.

Q. Who provided the blueprints?

A. Kay Builders.

Q. Okay. And who provided the building materials?

A. Kay Builders.

Q. Now, did any of your daily duties have anything to do with enforcing safety issues?

A. Yes, it did. It pertained to, if I was bringing in a potential client or a potential homeowner or a homeowner or one of my employees or fellow employees, to go in, make sure that there was fall protection at the stairwells, windows were railed off, see that there wasn't a lot of debris laying around. If the mason was working out front, for example, make sure the door was taped off and planked.

You know, that type of thing.

....

Q. Were you responsible for scheduling when contractors would work at let's say windsor woods project?

A. When it pertained to the rough end of construction, yes.

Q. Would you coordinate the work among the subcontractors or the independent contractors?

A. Say that again, please.

Q. Would you coordinate the work-was there ever a time during the rough stages where there would be more than one contractor working at the property?

A. Yes

Q. And would you be responsible for coordinating the work?

A. Yes.

Q. And did you schedule the deliveries?

A. Yes.

Q. And I think you already told us that you would walk through the site to evaluate the progress?

A. Yes.

Q. And you would walk through the property to evaluate the progress to make sure that it was done on schedule or at least the work was on schedule?

A. Yes.

Q. And to make sure that the work was being done

properly?

A. Just that it met what Kay standards was building.

Q. When you say met what Kay' standards was building, what do you mean by that?

A. Well, that they were following the blueprint.

Q. Did you ever see any independent contractors, while you were with Kay, erect ladders inside the house, homemade ladders?

A. Yes.

Q. On, approximately, how many occasions did you see that?

A. Once.

Q. And what did you do when you saw it?

A. Stopped it.

....

Q. Had you ever seen a written agreement with Kay and any independent contractors?

A. No

Q. Did anyone tell you from Kay that you didn't have responsibility to make sure that the independent contractors were performing safely?

A. I don't recall it — I don't recall.

....

[Plaintiff's counsel] Q. Did—was Kay able to shut down the job site at Windsor Woods at anytime they wanted?

[Kay president R. Koze] A. I suppose. We have never done it, but I suppose, yeah.

(See Pl. brf. [unpaginated] (quoting Dep. testimony of Alban and Koze).)

Viewing this deposition testimony cited by plaintiff and even accepting, arguendo, his characterizations of that testimony, the record evidence does not admit of a reasonable inference that Kay controlled the manner in which the work was to be performed by Lima. Instead, as in *LaChance* and *Hader*, Kay charged its on-site employees only with inspecting the work and ensuring the "result to be obtained.'" Thus, like the defendant in *Hader*, at most, Kay's representative constituted a continuous presence of a "watchdog" employee. But, as in *Hader*, there is no indication Kay's personnel gave explicit orders to Lima's employees so as to interfere with that subcontractor's control of the work. At most, on these facts viewed in the light most advantageous to plaintiff, Kay employed a person to ascertain that the work of the independent contractor was being performed in accordance with plans and specifications, and the employment of such personnel did not subject Lima to the control of Kay to the extent necessary for liability to arise.

Nor, unlike the situation prevailing in *Bullman*, supra, is there any plausible basis here to conclude that Kay failed to relinquish control over the part of the property where plaintiff sustained his injury. Unlike *Bullman*, this is not a case in which a visitor was injured as a result of the

property-owner/construction-manager's failure to exercise reasonable care to his invitee in relation to property still under his control. The record cited by Kay renders it evident and uncontested that Lima was the subcontractor in charge of installing the roof sheathing upon which its employee, plaintiff, lost his footing and fell. Further, unlike *Byrd,* supra, there can be no contention that the order in which the subcontractors performed their work at the behest of Kay caused the injury in question. Therefore, in the absence of a record from which it may reasonably be inferred, under the controlling principles of decisional law, that Kay controlled the manner of work so as to incur liability for injury to a subcontractor's employee, summary judgment must be entered in favor of Kay.

## IV.

For the foregoing reasons, no genuine issue of material fact exists to warrant submission of the present matter to the finder of fact. Kay is, therefore, entitled to judgment as a matter of law pursuant to the accompanying order, which directs the entry of summary judgment in its favor.

## ORDER

And now, July 24, 2012, upon consideration of defendants' motion for summary judgment, filed on February 15, 2012, and plaintiff's response thereto, filed on May 15, 2012, and after argument held on July 20, 2012, and for the reasons set forth in the accompanying opinion, it is ordered that said motion is granted and plaintiff's claims are hereby dismissed with prejudice.