# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Randolph Carpenter,                           :
                        Appellant        :
                                :
             v.                   :       No. 1123 C.D. 2021
                                :       Argued: March 7, 2023
William Penn School District        :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT                  FILED: May 4, 2023

        Randolph Carpenter appeals an order of the Court of Common Pleas of Delaware County (trial court) granting the William Penn School District's (School District) motion for summary judgment and dismissing Carpenter's complaint with prejudice. In his complaint, Carpenter asserted a claim under Section 3 of the Whistleblower Law,[1] which prohibits an employer from retaliating against an employee who makes a good faith report of wrongdoing by a public body. On appeal, Carpenter argues that the trial court erred in concluding that he did not demonstrate a causal connection between his reports of the School District's wrongdoings and its retaliatory employment acts. Specifically, in reaching this conclusion, the trial court made factual findings and credibility determinations in the light most favorable to the School District, which is inappropriate at the summary judgment stage of litigation. After review, we reverse and remand the matter to the trial court for further proceedings.

---

[1] Act of December 12, 1986, P.L. 1559, *as amended*, 43 P.S. §1423.

**Background**

Carpenter is a current employee of the School District and has been employed in various positions since October 2009. For the 2016-2017 school year, Carpenter accepted a newly created School District position as an emotional support supervisor. In this capacity, Carpenter oversaw and developed emotional support programs throughout the School District. He also served as the School District's liaison with the Child Guidance Resource Center (Child Guidance), a third-party contractor that provides emotional support services to School District students.

After Carpenter began work in this new position, he registered several complaints of wrongdoing by the School District including: (a) failure to maintain a safe "time out" room for student behavior de-escalation; (b) failure to implement Individualized Education Plans (IEPs) as required by the Individuals with Disabilities Education Act, 20 U.S.C. §1400; (c) failure to maintain the staffing level of social workers and mental health workers needed to serve special education students; (d) submission of fraudulent IEPs to the Pennsylvania Department of Education; and (e) submission of fraudulent billing for therapy and counseling services to Medicaid. Carpenter registered these complaints with Catherine Greenstein, his supervisor and the director of the special education department; Jane Harbert, the School District's superintendent; Joseph Conley, the human resources director; and the School District's Board of School Directors (School Board).

By letter of July 10, 2017, the School District notified Carpenter that it had eliminated his emotional support supervisor position and offered him four other positions. Carpenter accepted a 7th grade English teaching position, a 9-month position that reduced his annual salary by approximately $17,000. Between 2017

2

and 2020, Carpenter applied for 14 promotions within the School District but was not selected for any of them.

Carpenter filed a complaint against the School District under the Whistleblower Law. The complaint alleged that the School District retaliated against Carpenter for registering good faith complaints of wrongdoing and waste. The retaliation consisted of demoting him to a teaching position and not promoting him to other positions for which he was qualified.

After discovery, the School District moved for summary judgment, asserting that Carpenter did not meet his burden under the Whistleblower Law of demonstrating that he had reported "wrongdoing or waste" as defined by the statute.[2] In any case, Carpenter did not demonstrate that his reports of alleged wrongdoing led to the elimination of his position as emotional support supervisor or to the School District's refusal to appoint him to other positions for which he was qualified. The School District's motion relied upon depositions of Carpenter, Greenstein, Harbert, and Conley; the transcript of Carpenter's *Loudermill* hearing;[3] the School District's objections and answers to Carpenter's two sets of interrogatories; the School District's July 10, 2017, letter notifying Carpenter that his position was eliminated; and the resumes of Carpenter and the candidates who were selected by the School District for the positions that Carpenter applied for between 2017 and 2020.

---

[2] Section 2 of the Whistleblower Law defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. §1422. "Waste" is defined as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 P.S. §1422.

[3] "A *Loudermill* hearing is a pre-termination hearing given to a public employee that is required by due process, as established in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985)." *Ray v. Brookville Area School District*, 19 A.3d 29, 31 n.2 (Pa. Cmwlth. 2011).

3

The facts of record, as developed in discovery, follow. After Carpenter began his work as an emotional support supervisor, he discovered that Greenstein had not hired the social workers and mental health professionals needed to provide the counseling services set forth in the IEPs of special education students. Carpenter Deposition at 41-43; Reproduced Record at 115a-17a (R.R.___). He found that the School District did not provide special education students the necessary materials and services, and it did not properly train the special education and emotional support teachers. Carpenter believed that the School District failed to provide a Free and Appropriate Public Education (FAPE) to students with disabilities, in violation of the Individuals with Disabilities Education Act. Carpenter registered his complaints about these shortcomings with Greenstein, Harbert, and the School Board.

Carpenter also discovered that the time-out room located at the Walnut Street Elementary School had exposed electrical outlets and a "sharp object." Greenstein Deposition at 48; R.R. 498a. Carpenter reported this to Greenstein, Harbert, Conley, and the School Board; however, no remedial action was taken until a student suffered an injury. Greenstein Deposition at 48-49; R.R. 498a-99a. As the director of special education, Greenstein was responsible for the safety of the time-out room. Carpenter Deposition at 95; R.R. 169a.

The School District acknowledged the existence of Carpenter's reports. In its response to Carpenter's first set of interrogatories, the School District stated that "the [School Board] was advised by [Carpenter] who stood on many occasions to make public comments about the time-out room with many people from the [School] District at large in attendance. Therefore, it is assumed that as many people know as [Carpenter] could humanly tell." School District's Objections and Answers

4

to Carpenter's First Set of Interrogatories ¶13; R.R. 1210a. In addition, Harbert testified that Carpenter had "the habit of bringing those [IEP-related issues] to a business meeting of our School Board Directors, which [was] disruptive during our business meetings." Harbert Deposition at 48; R.R. 1170a.

Carpenter found that the School District had submitted incomplete IEPs to the Pennsylvania Department of Education, which Carpenter believed was done to obtain more funding. Specifically, many IEPs submitted to the Department of Education, which were finalized by Greenstein, provided only basic demographic information. The Department of Education does not review the IEPs; it "just count[s]" the IEPs marked as finalized. Greenstein Deposition at 72; R.R. 522a. When confronted by Carpenter, Greenstein stated that "it's our dirty little secret here." Carpenter Deposition at 167; R.R. 241a. Carpenter registered this complaint with Harbert, Conley, and the School Board. The School District assigned a solicitor to investigate the matter, who determined that Carpenter's allegations were unfounded. Harbert Deposition at 46; R.R. 1170a.

Carpenter discovered that the School District requested reimbursement for therapy services during periods of time when no therapist was available to students. Carpenter Deposition at 193; R.R. 267a. When Carpenter questioned Greenstein, she denied this claim. *Id*. at 203-04; R.R. 277a-78a.

In the summer of 2017, during the extended school year program, Carpenter learned that the School District permitted a student who had sexually assaulted other students to attend classes in a regular classroom, without notification to parents and teachers. Carpenter Deposition at 109-12; R.R. 183a-86a. Carpenter registered a written complaint with the School District for failure to notify teachers and parents to ensure the safety of the students.

5

Days later, on July 10, 2017, the School District notified Carpenter by letter that his position was being eliminated due to budgetary constraints. Carpenter requested to "finish out the week" so that he could provide documentation to the teachers, particularly in regard to the student with a history of sexual misconduct. Carpenter Deposition at 123-24; R.R. 197a-98a. The School District refused.

Carpenter testified that during the School Board budget meeting held in June of 2017, Jennifer Hoff, the School Board president, stated that all District employees to be furloughed for budgetary reasons had already been notified. Carpenter Deposition at 210, 215; R.R. 284a, 289a. Carpenter did not receive that notification, and he was unaware that his position would be eliminated prior to receiving the letter of July 10, 2017.

With respect to the budget, the School District stated that Greenstein "worked together with other administrative District professionals to reduce costs as the result of necessary budget cuts for the upcoming school year," and she decided to eliminate the emotional support supervisor position. School District's Objections and Answers to Carpenter's First Set of Interrogatories ¶6; R.R. 1207a. The School District also stated that Carpenter "was not demoted as the result of poor performance[.]" *Id*. ¶7; R.R. 1207a. Nevertheless, when asked whether Carpenter's performance "played any part in [its] decision to 'de-fund' the Emotional Support Supervisor position," the School District responded:

> Yes and No. "No" to the extent that the position was only created and active for a year or less and was more of a "wish list item" than a "needs list item" in the Special Education Department; and "yes" because [Carpenter] did not perform in such an extraordinary manner that made it impossible for the administration to eliminate the position – [Carpenter's] performance evaluation for that year yielded 11 "needs

6

improvements" which could not <u>alone</u> justify keeping an unnecessary position in the Special Education Department.

School District's Objections and Answers to Carpenter's Second Set of Interrogatories ¶41; R.R. 1229a (emphasis in original).

Conley, the human resources director, testified that the emotional support supervisor position was created to meet "the needs of our children." Conley Deposition at 27; R.R. 615a. He explained that the School District decided to eliminate that position because it was "a brand new position . . . only in place for one year," and its contractor, Child Guidance, could provide "some of the services" assigned to the position. *Id*. at 58; R.R. 646a. Conley testified that he and Greenstein attempted on numerous occasions to conduct a performance evaluation with Carpenter; however, they did not complete the evaluation until after Carpenter's position was eliminated.

Greenstein testified that the decision to eliminate the emotional support supervisor position and two assistant principal positions was made by the superintendent, Harbert, before the budget was adopted in June of 2017. Greenstein testified as follows:

> I didn't make that decision. I was asked [by Harbert] my opinion of whether the position was necessary, and . . . we had come to find out that Child Guidance provided a clinical supervisor for their [sic] staff, so it didn't seem necessary to have an additional supervisor for emotional support.

Greenstein Deposition at 91-92; R.R. 541a-42a. Greenstein also testified that the School District attempted to notify Carpenter about the decision "for about [a] month and a half over the summer" but was unable to contact him. Greenstein Deposition at 93; R.R. 543a.

7

The record established that between 2017 and 2020, Carpenter applied for 14 positions within the School District for which he was turned down. These positions included teacher on special assignment, supervisor of secondary special education, assistant principal, acting assistant principal, special education supervisor, supervisor of innovation and personalized learning, and English/social studies coaching. The School District responded that Carpenter was "minimally qualified for each position" and that "the successful candidates were better suited for the positions due to good interview answers and good previous experience." School District's Objections and Answers to Carpenter's Second Set of Interrogatories, ¶34; R.R. 1226a.

Carpenter has a bachelor's degree in communication and a master's degree in multi-cultural education, and he is certified for special education, English instruction, and administrative principal. Carpenter has received several awards during his employment with the School District, including Middle School Teacher of the Year, Making a Difference Award, and Special Educator of the Month. For the 2016-2017 school year, in which he served in the emotional support supervisor position, Carpenter's performance evaluation included one "distinguished," seven "proficient," and eleven "needs improvement" rankings. School District's Objections and Answers to Carpenter's First Set of Interrogatories, ¶11; R.R. 1209a. Carpenter's performance was not assessed as "unsatisfactory" because he did not receive any "failing" rankings. *Id.*

**Trial Court Decision**

By order and opinion dated June 3, 2021, the trial court granted summary judgment to the School District and dismissed Carpenter's complaint with prejudice. The trial court held that the record lacked "concrete facts" to establish a causal connection between Carpenter's reports of alleged wrongdoing and the School District's elimination of his position and subsequent refusals to hire him for other positions. Trial Court Op. at 6 (quoting *Golaschevsky v. Department of Environmental Protection*, 720 A.2d 757, 759 (Pa. 1998)). The record did not establish that Greenstein, Harbert, Conley, or the School Board threatened adverse consequences against Carpenter because of his reports. The trial court criticized Carpenter's "vague circumstantial evidence." Trial Court Op. at 7. Nevertheless, it found that Carpenter established the following:

- [Carpenter] was hired into this newly created role for the 2016-2017 school year and it was during this year that [he] registered his reports of alleged wrongdoings.

- Within days of his last complaint, the [School District] eliminated his position, allegedly due to budgetary reasons.

- At a School Board meeting on June 12, 2017, the [School Board] President stated that all employees who could potentially be furloughed for budgetary purposes had already been notified; however, [Carpenter] had not been given notice at this time.

*Id*. However, the trial court rejected Carpenter's suggested "inference of retaliatory intent" by the School District as "unreasonable and inconsistent" with the other record evidence. Trial Court Op. at 7. The trial court dismissed Carpenter's temporal proximity argument because, "in light of Greenstein's testimony," the

decision to eliminate Carpenter's position was made before Carpenter's final report of alleged wrongdoing in July of 2017. *Id*. at 8-9.

On the School District's decision not to hire him for any of the positions for which Carpenter applied between 2017 and 2020, the trial court held that Carpenter's personal belief that he was more qualified than the selected candidates did not demonstrate causation that could "withstand summary judgment." Trial Court Op. at 10. Specifically, the record lacked evidence on the identity of the interviewers or the experience criteria used to evaluate the candidates. Carpenter's evidence did not demonstrate that he outperformed the other candidates during the interview process or that the hiring committees relied upon Greenstein's performance evaluation in making their decision not to hire him for any of the 14 positions.

Concluding that Carpenter did not meet his burden of demonstrating a causal connection between his reports of wrongdoing and the School District's decisions to eliminate his position as emotional support supervisor and not to promote him, the trial court held that he did not establish a *prima facie* case for a claim under the Whistleblower Law. Accordingly, the trial court did not reach the issue of whether Carpenter's complaints consisted of reports of "wrongdoings" or "waste," as defined by the Whistleblower Law. Trial Court Op. at 6.

Carpenter appealed to this Court.[4]

---

[4] On August 31, 2021, the Superior Court transferred Carpenter's appeal to this Court.

## Appeal

On appeal,[5] Carpenter raises two issues for our consideration.[6] First, he argues that the trial court erred in granting summary judgment because there is a dispute of material fact surrounding the School District's elimination of his position as emotional support supervisor and its refusal to promote him to positions for which he was qualified. Second, he argues that the trial court erred because it made factual findings in a summary judgment motion and did not view the record in a light most favorable to the non-moving party, Carpenter. Instead, the trial court viewed the record in a light most favorable to the School District.

### I. Disputed Facts on Causation

In his first issue, Carpenter argues that the trial court erred in granting summary judgment because the record demonstrates that the facts material to the causal connection between his reports of wrongdoings and the School District's decisions on his employment are disputed. Carpenter argues that the trial court misconstrued *Golaschevsky*, 720 A.2d 757, and its progeny to mean that causation can be established only through direct evidence. To the contrary, "surrounding circumstances" can establish causation. *Id*. at 759; *Evans v. Thomas Jefferson University*, 81 A.3d 1062, 1070 (Pa. Cmwlth. 2013). Moreover, Carpenter argues, *Golaschevsky* and *Evans* are distinguishable. In those cases, the record lacked any evidence of a retaliatory reason for the employer's action. By contrast, here, the

---

[5] "On appeal from a trial court's order granting or denying summary judgment, our standard of review is de novo and our scope of review is plenary." *Brewington v. City of Philadelphia*, 149 A.3d 901, 904 n.3 (Pa. Cmwlth. 2016). Summary judgment is properly entered only when, "after examining the record in the light most favorable to the non-moving party, and resolving all doubts as to the existence of a genuine issue of material fact against the moving party, the moving party is clearly entitled to judgment as a matter of law*." Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011).

[6] Carpenter's statement of the questions raises three issues, which we combine into two for clarity.

record evidence demonstrates "sufficient temporal proximity to support an inference of retaliatory intent." Carpenter Brief at 34.

The record shows that on July 10, 2017, the School District notified Carpenter that his position as the emotional support supervisor was being eliminated *days* after he filed his most recent complaint of wrongdoing. The stated reason was budgetary; however, Carpenter's evidence showed that all employees under consideration for furlough due to budget cuts were notified before the June 2017 School Board meeting. Carpenter was not notified until July. Carpenter also points out that the School District offered inconsistent reasons for his demotion, which "may be viewed as evidence tending to show pretext." Carpenter Brief at 34 (quoting *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001)). For example, in discovery, the School District did not cite the budget but stated that his position was eliminated because Carpenter "did not perform in such an extraordinary manner that made it impossible for the administration to eliminate the position." School District's Objections and Answers to Carpenter's Second Set of Interrogatories ¶41; R.R. 1229a. The evidence also showed that Greenstein and Harbert, to whom Carpenter registered most of his complaints of wrongdoings, were the ones who made the decision to eliminate his position, and their "dissatisfaction with [Carpenter] voicing his concerns" was well documented in the record, including Harbert's deposition. Carpenter Brief at 35.

Carpenter asserts that this body of circumstantial evidence, taken as a whole, demonstrates that "at the very least, a genuine issue of material fact exists" as to whether his position as emotional support supervisor was eliminated due to budgetary reasons, performance concerns, or retaliatory reasons. Carpenter Brief at 36.

12

Carpenter further asserts that the School District's proffered reason that the selected candidates for the 14 positions for which he applied between 2017 and 2020 were "better suited" based on their "good previous experience" is implausible. Carpenter Brief at 36 (citing School District's Objections and Answers to Carpenter's Second Set of Interrogatories, ¶34; R.R. 1226a). Carpenter contends that it defies logic that "an internal candidate who has been employed [] for ten years and possesses supervisory experience and extensive special education experience, would be rejected for fourteen positions over the course of two years for legitimate non-retaliatory reasons." *Id*. at 37. Carpenter argues that the "implausibility" in the School District's proffered reason for its action supports the inference that the School District acted for retaliatory reasons. *Id*. (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

The School District counters that the record lacks direct evidence that Carpenter's reports had adverse consequences for Carpenter's employment. Rather, the record consists of "unjustified and unwarranted inferences and speculation, or insufficient, vague, circumstantial evidence of alleged retaliation." School District Brief at 17-18. The School District argues that the temporal proximity between Carpenter's reports and the elimination of his position as emotional support supervisor does not, by itself, support a reasonable inference of retaliatory intent. *Id*. at 18. Further, Carpenter did not prove that he was more qualified than the successful candidates hired for the jobs for which he applied, and he presented no evidence that he outperformed other candidates during the interview process. The School District argues that Carpenter offered nothing more than a "subjective personal opinion" that his reports of wrongdoings caused the School District not to hire him for those positions. School District Brief at 40.

13

A motion for "[s]ummary judgment is properly granted where there is no genuine issue of material fact as to a necessary element of a cause of action and the moving party has clearly established entitlement to judgment as a matter of law." *LaChance v. Michael Baker Corporation*, 869 A.2d 1054, 1056 n.3 (Pa. Cmwlth. 2005). For the purposes of summary judgment, "[a] fact is material only if it directly affects the disposition of the case." *Pyeritz v. Commonwealth*, 956 A.2d 1075, 1079 (Pa. Cmwlth. 2008) (citing *Allen v. Colautti*, 417 A.2d 1303 (Pa. Cmwlth. 1980)). "All doubts as to the existence of a genuine issue of a material fact are to be resolved against the granting of summary judgment." *Shoats v. Commissioner, Pennsylvania Department of Corrections*, 591 A.2d 326, 330 (Pa. Cmwlth. 1991). "[T]he questions of whether there are material facts in issue and whether the moving party is entitled to summary judgment are matters of law." *Alderwoods (Pennsylvania), Inc. v. Duquesne Light Company*, 106 A.3d 27, 34 n.5 (Pa. 2014).

Materiality is governed by the standards in the Whistleblower Law. Section 3(a) states, in pertinent part, as follows:

> (a) Persons not to be discharged.--No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 P.S. §1423(a). The "Whistleblower Law protects employees who come forth with good faith reports of wrongdoing by publicly[ ]funded employers; it does so by prohibiting retaliatory conduct from the employer, and by providing a civil remedy

14

for employees when employers violate the law's provisions." *Harrison v. Health Network Laboratories Limited Partnerships*, 232 A.3d 674, 681 (Pa. 2020).

Section 4(b) of the Whistleblower Law sets forth the evidentiary standard needed to establish a *prima facie* case of a violation. It states, in pertinent part, as follows:

> (b) Necessary showing of evidence.--An employee alleging a violation of this act *must show by a preponderance of the evidence* that, *prior to the alleged reprisal*, *the employee* or a person acting on behalf of the employee had *reported* or was about to report *in good faith, verbally or in writing, an instance of wrongdoing or waste* to the employer or an appropriate authority.

43 P.S. §1424(b) (emphasis added). To make a *prima facie* case for wrongful discharge, "the plaintiff must show both a protected report of wrongdoing or waste and a causal connection between that report and the discharge." *Evans*, 81 A.3d at 1064 (citing *O'Rourke II v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001)). Where a plaintiff makes this showing, the burden shifts to the employer to prove "by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual." Section 4(c) of the Whistleblower Law, 43 P.S. §1424(c).

The trial court concluded that Carpenter did not make a *prima facie* case because he did not demonstrate a causal connection between his reports of wrongdoings and the School District's elimination of his position as emotional support supervisor and its subsequent failure to hire him for other positions. In so holding, the trial court relied on *Golaschevsky*, 720 A.2d 757, and *Evans*, 81 A.3d 1062.

15

In *Golaschevsky*, an employee of the Pennsylvania Department of Environmental Protection (DEP) reported that some of his co-workers in the District Mining Office were violating federal copyright law. Golaschevsky's supervisor encouraged him to submit a detailed written report about these alleged violations, but he did not do so. Several weeks later, Golaschevsky received a negative interim performance evaluation, which was followed by a list of projects to be completed in the next 90 days. Four months later, Golaschevsky received an unsatisfactory performance evaluation for not completing the assignments on time, and his employment was terminated.

Golaschevsky filed a whistleblower complaint, alleging that his report of the copyright violations caused his discharge. After discovery, DEP filed for summary judgment, which was granted by this Court. On appeal, the Supreme Court considered, *inter alia*, whether Golaschevsky's evidence satisfied the causation requirement set forth in the Whistleblower Law. Concluding that the record showed Golaschevsky was terminated because of his inability to complete assignments in a timely manner, the Supreme Court affirmed the grant of summary judgment. The Supreme Court explained why Golaschevsky's evidence was inadequate:

> *Gray* [*v. Hafer*, 651 A.2d 221 (Pa. Cmwlth. 1994),] correctly held that, to make out a prima facie case of retaliatory termination pursuant to the Whistleblower Law, *a plaintiff must "show by concrete facts or surrounding circumstances that the report led to the employee's dismissal*, such as that there was specific direction or information received not to file the report or that there would be adverse consequences because the report was filed." *Gray*, 651 A.2d at 225.
>
> Here, Appellant does not present sufficient evidence to establish a causal connection between his report and his termination. He does not allege that his supervisors threatened to fire him or to impose any other adverse consequences because of his report, nor does he establish any other "concrete facts" to connect the

16

report with the dismissal. *Instead, in attempting to show a causal connection, Appellant relies solely on vague and inconclusive circumstantial evidence.*

For example, Appellant alleges that, prior to his December 20, 1993 meeting with Linnan regarding the alleged copyright violations, his supervisors had not indicated any dissatisfaction with his work. Appellant claims that his report of alleged wrongdoing touched off a series of retaliatory actions, including negative performance evaluations, lack of cooperation from fellow employees and supervisors, withholding of information regarding computer software, and, ultimately, termination of Appellant's employment. *However, this "evidence" constitutes nothing more than Appellant's perception of how others treated him after he made the December 20, 1993 report—a perception that is obviously colored by Appellant's interest in proving that he is a victim of retaliatory discharge.*

Viewing the evidence objectively, Appellant's termination apparently was the result of his unsatisfactory work performance, and had nothing to do with his report of alleged copyright violations. *Indeed, rather than punishing him for making an oral report of alleged wrongdoing, Appellant's supervisors encouraged him to follow up on the matter and produce a written report, though he apparently never did so.*

*Golaschevsky*, 720 A.2d at 759-60 (emphasis added).

In *Evans*, 81 A.3d 1062, the plaintiff, a nurse, filed a whistleblower complaint against her employer, a drug treatment center. After reporting that the director had violated the policy on methadone distribution, Evans alleged that the director acted in a rude or hostile manner toward her; her annual performance rating dropped from "outstanding" to "effective;" and she was disciplined about her conduct with patients and with a new employee. *Id.* at 1066–68. Ultimately, her employment was terminated. Notably, the evidence was undisputed that the plaintiff's behavior towards patients was an issue that pre-dated her report of the

director's wrongdoing. Further, her performance evaluation on patient interaction was the same before and after the report. *Id.* at 1070.

This Court affirmed the grant of summary judgment to the employer because Evans did not demonstrate a causal connection by "concrete facts or surrounding circumstances." *Evans*, 81 A.3d at 1070. We explained:

> Given the undisputed fact that Evans had been told before 2010 that there were patient complaints that she acted "harsh" and had received the same "Needs Improvement" rating concerning her interaction with patients in January 2009 as she did after the report, and the lack of any genuine dispute that the patient complaints and co-worker complaints for which she was disciplined actually occurred, [Evans'] evidence is insufficient to meet her burden of showing a causal connection.

*Id.* In short, Evans offered the "very same type of evidence that the Supreme Court held insufficient in *Golaschevsky*." *Id.* at 1071. "[T]he mere fact that the discharge occurred a few months after a report of wrongdoing and that the first formal negative actions by the employer occurred after the report are *not* enough to show a causal connection." *Id.* at 1070-71 (citing *Golaschevsky*, 720 A.2d at 759-60) (emphasis in original).

In sum, *Golaschevsky* and *Evans* established that a *prima facie* case of retaliation under the Whistleblower Law requires the plaintiff to "show by concrete facts *or surrounding circumstances* that the report [of wrongdoing or waste] led to [the plaintiff's] dismissal." *Golaschevsky*, 720 A.2d at 759 (quoting *Gray*, 651 A.2d at 225) (emphasis added). However, a negative employment evaluation that happens to follow, by several months, a report of wrongdoing, or the employee's personal perception of how he or she is treated, is evidence too "vague and inconclusive" to satisfy the plaintiff's threshold burden. *Golaschevsky*, 720 A.2d at 759-60; *Evans*, 81 A.3d at 1070-71.

18

Here, as the trial court correctly pointed out, Carpenter did not allege that his supervisors threatened retaliation because of his reports. That does not end the inquiry. A causal connection between the report of alleged wrongdoings and negative employment acts can be demonstrated by circumstantial evidence. *Golaschevsky*, 720 A.2d at 759.

It is not disputed that the elimination of Carpenter's position as emotional support supervisor occurred *days* after his most recent report of wrongdoing. The School District asserted that the position was eliminated due to budget cuts, but Carpenter did not receive notice in advance of the budget's adoption, as did the other employees furloughed for budgetary reasons. The record presents more than Carpenter's "personal perception" of a negative response to his reports. *See Golaschevsky*, 720 A.2d at 759-60. For example, Harbert, the superintendent who made the decision to eliminate Carpenter's position, described his bringing IEP-related issues to the School Board meetings as "disruptive." Harbert Deposition at 48; R.R. 1170a. The School District claimed that Carpenter "did not perform in such an extraordinary manner that made it impossible for the administration to eliminate the position" because his "performance evaluation for that year yielded 11 'needs improvements.'" School District's Objections and Answers to Carpenter's Second Set of Interrogatories ¶41, R.R. 1229a; Conley Deposition at 48-53, R.R. 636a-41a. This statement undermines the claim that the School District's decision was solely based on budget. In any case, the performance evaluation was done after Carpenter's position was eliminated.

In both *Golaschevsky* and *Evans*, the record established an undisputed reason for the termination of employment, *i.e.*, unsatisfactory job performance. In

19

each case, the employee presented no evidence, other than "personal perception," that a report of wrongdoing had led to the termination of employment.

By contrast, here, the record shows that Carpenter did not have a history of unsatisfactory work performance prior to making his reports. Further, his performance evaluation was done only after his position as emotional support supervisor was eliminated. The School District's July 10, 2017, notification letter to Carpenter stated that budget cuts caused the elimination of his position, but other evidence showed that all employees, except Carpenter, had received notice of their furlough before the budget was adopted in June. The School District could have sent this letter in June of 2017, and there is no explanation for Carpenter's immediate dismissal without allowing him to finish the week. The School District's notice of his furlough shortly followed Carpenter's complaint about its handling of a student with a history of sexual assault. Taken as a whole, the record demonstrates a genuine issue of material fact as to whether the elimination of Carpenter's position as emotional support supervisor was due to his reports of alleged wrongdoing. The trial court erred in otherwise holding.

Carpenter also argues that his reports of alleged wrongdoings were causally related to the School District's decision not to hire him for other positions between 2017 and 2020. Here, the School District asserted that it chose "better suited" candidates who had "good previous experience" and gave "good interview answers." School District's Objections and Answers to Carpenter's Second Set of Interrogatories, ¶34; R.R. 1226a.

Carpenter responds that a comparison of the experience of the selected candidates to his experience casts "serious doubt" on the School District's "vague" explanation for its hiring decisions. Carpenter Brief at 22, 36. This is particularly

true because the School District agreed that it gives special consideration to "internal" candidates, such as Carpenter. *Id*. at 24.

Carpenter focuses on four positions to make his argument that he was objectively more qualified than the candidate selected. In April of 2018, Carpenter applied for the position of supervisor of secondary special education. Despite the fact that Carpenter had eight years of special education experience with the School District as well as experience in administrative and supervisory roles, the School District selected an external candidate who had no supervisory or administrative experience. *See* Morris Resume, R.R. 1238a-40a. In August of 2018, Carpenter applied for two acting assistant principal positions at Penn Wood High School. Again, the School District selected two candidates who had no administrative or supervisory experience, explaining that the "committee felt that they had the best qualifications for that particular position." Conley Deposition at 67, R.R. 655a. In October of 2019, Carpenter applied for the position of supervisor of elementary special education. The School District selected an external candidate for the position, who had less teaching experience than Carpenter and possessed only one year of administrative experience at the time of her selection. Marvil Resume, R.R. 1258a-59a. Finally, in August of 2020, Carpenter applied for the position of assistant principal at Penn Wood Middle School, for which the School District selected an external candidate without supervisory experience and certified only to teach elementary K-6. Spivey Resume, R.R. 1261a. By contrast, Carpenter was certified to teach at the middle school level. As for other positions for which Carpenter applied, the School District stated that "other candidates were selected that were deemed to be more qualified." Conley Deposition at 70; R.R. 658a.

21

Carpenter testified that in each case he had experience more relevant than that of the successful candidates. The trial court dismissed this testimony as "personal perception" that was insufficient to prove causation. *See Golaschevsky*, 720 A.2d at 759-60. However, the experience of all the candidates, including Carpenter, was objectively established in their resumes. This is not mere "personal perception."

The School District asserted that it did not base its hiring decision solely on experience but also on "good interview answers." School District's Objections and Answers to Carpenter's Second Set of Interrogatories, ¶34; R.R. 1226a. Conley's testimony contradicts the School District's assertion in this regard. Conley, the human resources director, testified that the hiring committees believed the selected candidates were "deemed to be more qualified" because they had experience in student discipline, parent relationships, overseeing large groups of teachers, and performing evaluations. Conley Deposition at 72-73; R.R. 660a-61a. Conley testified that Carpenter did not have experience in evaluating teachers. *Id.* at 73; R.R. 661a. The School District acknowledged, however, that Carpenter was "minimally qualified for each position" for which he applied. School District's Objections and Answers to Carpenter's Second Set of Interrogatories, ¶34; R.R. 1226a. Even so, Carpenter was not invited to interview for each position. Carpenter Deposition at 224-26; R.R. 298a-300a.

Further, Greenstein, the recipient of the reports of alleged wrongdoing, served on the committee that interviewed Carpenter for the position of supervisor of secondary special education. It can be inferred that at least this committee, out of 14, knew of Carpenter's reports of wrongdoing. Conley testified that the candidate selected for supervisor of secondary special education "was the best fit for the

22

position," on the basis of experience. Conley Deposition at 66; R.R. 654a. Carpenter disputed that assertion, testifying that the selected candidate, a former extended school year coordinator, had "never taught secondary" education. Carpenter Deposition at 231; R.R. 305a. Carpenter had many years of experience in special education.

Considering the evidence in a light most favorable to Carpenter, as we must, we conclude that the record refutes the School District's claim that interviews played an important role in the hiring decision and that the other candidates had superior work experience. Accordingly, the record demonstrates that a genuine issue of material fact exists as to whether the School District's refusal to hire Carpenter for other positions between 2017 and 2020 was connected to his reports of alleged wrongdoing.

On his second basis for retaliation, *i.e.*, failure to promote, we conclude that Carpenter's causation evidence is enough to get the question of causation to a jury.

## II. Trial Court's Factual Findings

In his second issue, Carpenter argues that in granting summary judgment to the School District, the trial court "repeatedly credited the [School District's] version of the events and made factual and credibility determinations" adverse to Carpenter. Carpenter Brief at 38. This is inappropriate at the summary judgment stage of litigation. The School District responds that the trial court "appropriately exercised its discretion" in holding that Carpenter failed to demonstrate a causal connection between his reports and the elimination of his position as emotional support supervisor. School District Brief at 28.

For the purposes of summary judgment, the record evidence must be viewed in the light most favorable to the non-moving party, and all doubts regarding the existence of a genuine issue of material fact must be resolved against the moving party. *Young v. Pennsylvania Department of Transportation*, 744 A.2d 1276, 1277 (Pa. 2000). "A fact is material only if it directly affects the disposition of the case." *Pyeritz*, 956 A.2d at 1079.

Here, the trial court credited the School District's explanation for eliminating Carpenter's supervisory position. The trial court stated that in "light of Greenstein's testimony, the Court finds [the School District's] elimination of [Carpenter's] position would have happened regardless of [Carpenter's] reports of alleged wrongdoing." Trial Court Op. at 8-9. The trial court further explained that "Greenstein's testimony undermines [Carpenter's] temporal proximity arguments because the decision to eliminate [Carpenter's] position was made *before* [Carpenter's] final report of alleged wrongdoing (in July of 2017), and was also made *before* the June 12, 2017 School Board meeting." Trial Court Op. at 9 (emphasis in original). However, the record shows that this fact is disputed and should not have been resolved in a summary judgment motion.

The trial court resolved all questions about the evidence in favor of the School District, which is contrary to the principles that govern summary judgment. Second, the trial court erred in making factual findings and credibility determinations. Specifically, the trial court credited Greenstein's testimony on the timing and reason for the elimination of Carpenter's position, even though other evidence contradicted that testimony. Viewing the evidence in the light most favorable to the non-moving party, *i.e.*, Carpenter, the record demonstrates that a genuine issue of material fact exists as to whether the elimination of Carpenter's

24

position was solely motivated by budgetary concerns. The trial court erred in holding otherwise.

## Conclusion

For the above reasons, we reverse the trial court's decision and remand the matter for further proceedings, including disposition of the remaining issue in the School District's motion for summary judgment, *i.e.*, whether Carpenter's complaints consisted of reports of "wrongdoing" or "waste" within the meaning of the Whistleblower Law.

_____
MARY HANNAH LEAVITT, President Judge Emerita

25

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Randolph Carpenter,                    :
                       Appellant       :
                                       :
          v.                           :          No. 1123 C.D. 2021
                                       :
William Penn School District           :

# **O R D E R**

AND NOW, this 4th day of May, 2023, the Court of Common Pleas of Delaware County's order dated June 3, 2021, in the above-captioned matter, is REVERSED. The matter is REMANDED to the trial court for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.


_____
MARY HANNAH LEAVITT, President Judge Emerita